**Cookie A. HUNTER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 355, 2011.**

Supreme Court of Delaware.

Submitted: Aug. 8, 2012.
Decided: Oct. 26, 2012.

---

9. *Wainwright v. State,* 504 A.2d at 1100.

10. *See* D.R.E. 103(d).

James M. Stiller, Jr., Esquire, Schwartz & Schwartz, P.A., Dover, Delaware, for appellant.

John Williams, Esquire, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

This is the defendant-appellant's, Cookie A. Hunter ("Hunter"), appeal from his judgments of conviction, after a Superior Court jury trial, of Assault in the Second Degree ("Assault"), Resisting Arrest with Force or Violence ("Resisting Arrest"), and Driving Under the Influence, First Offense ("DUI"). Hunter raises two issues in this direct appeal. First, Hunter argues that it was error for the trial judge to admit the results of his blood alcohol content ("BAC") blood test into evidence because the foundational requirements necessary to admit that scientific evidence were not met. Second, Hunter contends that the trial judge erred by not granting his motions for judgments of acquittal on the Assault and Resisting Arrest charges, because the State failed to preserve the videotape that recorded the events that led to those charges.

We have concluded that the results of Hunter's BAC test were erroneously admitted into evidence. Therefore, the DUI judgment of conviction must be reversed. We have determined that Hunter's motions for judgments of acquittal on the Assault and Resisting Arrest charges were properly denied. Therefore, those convictions are affirmed. Consequently, the judgments of the Superior Court are affirmed in part and reversed in part. This matter is remanded for further proceedings in accordance with this opinion.

### Facts[1]

At approximately 10:30 p.m. on September 2, 2009, Smyrna Police Department Officer Brandon L. Dunning ("Officer Dunning") and his partner Sergeant Moore were travelling in an unmarked car near the area of North Main Street and West Glenwood Avenue in the town of Smyrna. Officer Dunning observed Hunter and another individual enter a tan Chevrolet S 10 truck. Hunter drove the truck across the grassy area of an apartment complex, into the property of a doctor's office, and then down a back alley. Officer Dunning followed the truck for approximately four-tenths of a mile. When Hunter did not signal a right hand turn onto Delaware Street, Officer Dunning initiated a traffic stop.[2]

---

1. The underlying facts are not in dispute. The disagreement between the parties relates to the consequences that should flow from those facts. This recitation relies primarily upon the facts as set forth in the State's brief.

2. A violation of Del.Code Ann. tit. 21, § 4155. Hunter does not appeal his conviction for this violation.

When the truck was stopped, Officer Dunning noticed that Hunter had red, bloodshot, and glassy eyes, emitted a moderate odor of alcohol, and appeared nervous. Hunter told Officer Dunning that he was coming from his mother's home in Dover, had made no stops, and had not been drinking alcohol. Beer cans were visible in the truck, including open cans on the floorboard.

Officer Dunning administered several field sobriety tests. After Hunter failed the alphabet and counting backwards test and the finger dexterity test, he was asked to do additional field sobriety tests outside his vehicle. Hunter was unable to perform the walk and turn and one leg stand tests.

As a result of failing the field sobriety tests, the presence of an odor of alcohol, and Hunter's red, bloodshot, and glassy eyes, he was handcuffed and placed in the rear seat of the police vehicle. Hunter began shouting that he was diabetic and needed to use his insulin pump. Officer Dunning unhandcuffed Hunter and allowed him to utilize his insulin pump. Thereafter, Hunter became uncooperative and had to be forcibly rehandcuffed.

Hunter was transported to the Smyrna police station. Officer Dunning testified about what happened at the police station after their arrival. Inside the police station, Hunter "became very uncooperative and combative," and started fighting with Officer Dunning. When Hunter was on the floor of the police station, he repeated that he was diabetic and stated that he was going to go into shock.

The police called 911 to obtain medical assistance for Hunter. An ambulance was dispatched from the Smyrna American Legion. In the meantime, Hunter was crawling on the floor of the police station and banging his head on the walls. By the time the ambulance arrived, Hunter had become combative and was fighting with Officer Dunning.

Daniel Greek ("Greek"), an emergency medical technician ("EMT") dispatched with the ambulance, testified that when he arrived at the Smyrna police station, Hunter was vulgar and combative. Greek determined that, although Hunter's blood glucose was high, it was not a life threatening situation. Greek testified that Hunter was not in an altered mental state and that Hunter was in control of his actions at the police station. Greek noted that Hunter was able to answer questions by medical personnel.

After the ambulance arrived at the Smyrna police station, a decision was made to take Hunter to Kent General Hospital in Dover. A stretcher was brought in to transport Hunter. Officer Dunning testified that Hunter's hands were handcuffed "because he was still being very combative and wanted to fight with us." When an effort was made to strap Hunter's legs to the stretcher, he began kicking. After Hunter violently kicked Greek in the right arm, Officer Dunning tasered Hunter in the left shoulder. Hunter did not lose consciousness, and after being tasered, he became cooperative.

As a result of being kicked by Hunter, Greek sustained serious injuries. An MRI was done on Greek's arm the next morning. According to Greek, "the elbow was basically destroyed. The ligaments were pulled away from the bones; and the bones themselves actually had some damage." Surgery was required to repair the damage to Greek's arm. As a result of his injury, Greek missed six months of work.

Eventually, Hunter was secured to the stretcher, and he was transported by ambulance to the hospital. At the hospital emergency room, Hunter "was still very volatile," and he refused to cooperate with a blood draw. Officer Dunning, two nurs-

es, and four other constables and security guards had to hold Hunter in order for the hospital phlebotomist, Roiann Gregory ("Gregory"), to take the blood sample.

When Hunter attempted to bite Officer Dunning during the hospital blood draw, he tasered Hunter a second time. Officer Dunning supplied Gregory with the police blood kit. Officer Dunning was present when Gregory took Hunter's blood sample.

Hunter's blood sample was taken at the hospital on September 2, 2009. The blood sample was tested on September 10 and 11, 2009, at the Delaware State Police Crime Laboratory by Deborah S. Louie "(Louie"). At the June 2010 Superior Court trial, Louie testified that Hunter's blood alcohol content on September 2, 2009 was 0.12%.

Hunter did not testify at his trial. The defense did present an expert medical witness, Gregory Villa Bona, M.D. ("Dr. Villa Bona"), who was Hunter's psychiatrist. The defense at trial to the charges of Assault and Resisting Arrest was not a denial that Hunter kicked Greek in the arm or engaged in combative and tumultuous behavior with Officer Dunning. Instead, the defense asserted that Hunter lacked the necessary *mens rea* to commit either of these two criminal offenses.

### The BAC Test

■ Hunter filed a motion to suppress his September 2, 2009 BAC test result of 0.12% because the blood test kit utilized by the Kent General Hospital phlebotomist, Gregory, had an August 31, 2009 expiration date. The Superior Court conducted an evidentiary hearing on Hunter's pretrial suppression motion. The only witness at the pretrial evidence suppression motion was Louie, an employee of the Delaware State Police Crime Laboratory. She is in charge of the blood alcohol testing program in Kent and Sussex Counties.

In her direct examination at the suppression hearing, Louie testified that "[t]he expiration date applies only to the vacuum within the tube that is in the kit." She stated that the expiration date does not affect the blood sample. Louie also testified that the expiration date "does not have any bearing on the chemicals that are contained within that tube."

During her cross-examination at trial, Louie was asked to read from the manufacturer's specification sheet as follows:

The quantity of blood drawn varies with altitude, ambient temperature, barometric pressure, and *tube age,* venous pressure, and filling technique. (emphasis added).

Louie was then asked to reread the paragraph because she had read the first occurrence of the word "incorrect" as "inaccurate." She was then asked to look under the heading "storage" and to read the highlighted portion there, which she did read as follows: "*Do not* use tubes after their expiration date." (emphasis added). Notwithstanding the manufacturer's admonition not to use tubes from an expired kit, the trial judge denied Hunter's pretrial and renewed suppression motions, based upon Louie's testimony that using an expired kit was immaterial to the results.

At trial, Hunter raised a second objection to the blood alcohol content evidence obtained from Hunter's September 2, 2009 blood draw. Officer Dunning testified that he was present with Hunter at Kent General Hospital on September 2, 2009, and witnessed Hunter's blood draw by Gregory. During defense counsel's cross-examination of Officer Dunning at trial, the following exchange occurred:

Q. You said a Roiann Gregory was the phlebotomist, is that correct, the one who took the blood?

A. Correct.

Q. So she extracted the blood into the tubes. And was Mr. Hunter still pretty much combative?

A. Yes.

Q. During the blood extraction, very combative?

A. Yes, sir.

Q. You said she put the blood in the tubes and then sealed it up and signed it, right—

A. Yes.

Q. —to prepare it for the evidence? Now, did you see her shake the tubes real good before she put them in the bag to make sure the tubes were mixed up properly?

A. They always perform that.

Q. Okay. So she shook it vigorously just to make sure everything was mixed up properly, right?

A. Yes.

After Officer Dunning testified that the phlebotomist shook the tube of Hunter's blood "vigorously," Hunter's trial attorney asked Officer Dunning to read aloud a portion of the collection kit instructions for a Qualified Blood Collector. Officer Dunning then read: "Item A: Immediately after blood collection, ensure proper mixing of anticoagulant powder by slowly and completely inverting the tubes at least five times. Do not shake vigorously." The written copy of the State Police blood collection instructions was introduced into evidence as Defense Exhibit # 1.

At the conclusion of the State's case-in-chief, Hunter moved for a judgment of acquittal on the DUI charge because the State failed to prove "the the blood draw was administered correctly." Defense counsel argued for dismissal of Hunter's DUI charge because "[t]here was testimony by the police officer that the vial was shaken vigorously. There was evidence admitted by the defendant that the instruction sheet on the blood test kit says: Do not shake vigorously. Clearly, that shows that the sample was taken incorrectly." The trial judge summarily denied the defense motion for a judgment of acquittal on the DUI charge.

■ Hunter contends that the Superior Court erred by admitting into evidence results of his BAC test for two independent reasons: first, because the test was administered after the kit's expiration date; and second, because the specific instructions for mixing the vial's contents were disregarded. We review a trial judge's denial of a motion to suppress after conducting an evidentiary hearing for abuse of discretion.[3]

■ In *Clawson v. State*, we stated that "the admissibility of intoxilyzer test results center on the State providing an adequate evidentiary foundation for the test result's admission."[4] We held that it was error for the trial court to admit into evidence the results of an Intoxilyzer 5000 test when it was determined that the manufacturer's protocol was not complied with before the test was administered.[5] Following the manufacturer's use requirements ensures the reliability of the scientific test.[6] It is this guarantee of reliability and accuracy that is the foundational corner-

---

**3.** *Rivera v. State,* 7 A.3d

**4.** *Clawson v. State,* 867 A.2d 187, 191 (Del. 2005).

**5.** *See id.* at 192 (finding that it was error to admit the results of the test when the State only observed the defendant for nineteen minutes when the manufacturer required a twenty minute observation period).

**6.** *Id.*

stone to the admissibility of the results of a scientific test. Without that guarantee of reliability, there exists too great a risk that a jury will be persuaded by scientific evidence that is unreliable.

In *Clawson*, we held that "the admission of a test result that was not in compliance with the manufacturer's requirements jeopardized the fairness of [a] trial."[7] In Hunter's case, using the expired vacutainer tubes in the blood test kit was in direct contravention of the manufacturer's specification sheet for the vacutainer tubes. In Hunter's case, shaking the tubes vigorously was in direct violation of the manufacturer's instructions for use of the kit.

In accordance with our holding in *Clawson v. State*, those two independent deviations from the manufacturer's required protocol, standing alone, each rendered the BAC test inadmissible due to the lack of a proper foundation. It was an abuse of discretion for the trial judge to deny Hunter's motion to suppress the results of the BAC test. Therefore, Hunter's DUI conviction must be reversed.

### Unpreserved Digital Recording

During his trial testimony, Officer Dunning explained that the Smyrna Police Department had a digital video recorder ("DVR") device to record activity occurring within the police station. That DVR rewrites itself (tapes over) older images after twenty-eight days. Officer Dunning testified that any recording of the interaction between Hunter and others at the police station was never preserved and was automatically taped over after twenty-eight days. Officer Dunning also testified that he never observed what may have been on the DVR system.

At a sidebar conference during Officer Dunning's trial testimony, defense counsel for Hunter stated to the trial judge, "Actually, Your Honor, I would ask—since we know the tape does not exist now, I would ask that the *Deberry* instruction be read eventually to the jury." The trial judge responded that any jury instructions would be discussed "at the close of evidence."

### Hunter's Defense

At the close of the State's case-in-chief on June 3, 2010, the defense moved for a judgment of acquittal on the charges of Assault and Resisting Arrest. Hunter's trial attorney argued that the State had failed to prove the *mens rea* element of either charge because there was no showing that Hunter was acting intentionally. In support of the dismissal motion, Hunter's attorney argued that "there was no persuasive testimony that says he was in control of his faculties. . . ." The trial judge found that "there is sufficient evidence on each of the charges presented by the State," and summarily denied the motion for a judgment of acquittal.

Following this ruling, the defense presented Dr. Villa Bona as an expert witness. Dr. Villa Bona testified that Hunter, who was thirty-three years old at the time of the trial, had juvenile-onset diabetes and now has insulin-dependent diabetes. Dr. Villa Bona also explained that Hunter suffers from post-traumatic stress disorder ("PTSD") as a result of two traumatic incidents when Hunter was a young teenager. First, when Hunter was a young teenager, he witnessed his father commit suicide. Second, prior to the father's suicide, Hunter "was cornered by several older boys and held down and raped." Dr. Villa Bona told the Superior Court jury that "[i]t was a traumatic event. His limbs were held; he was struck repeatedly. They used objects. And he had a rather rough time with that."

7. *Id.* at 193.

When asked at trial how the two prior traumatic incidents in Hunter's life would affect the patient's behavior if Hunter was being forcefully restrained in the police station, Dr. Villa Bona said, "It would very likely cause him to resist more than the regular person." When asked if Hunter might become violent if involuntarily restrained, Dr. Villa Bona stated: "He would probably respond in any way possible not to be tied down to be forcefully held."

Dr. Villa Bona testified that Hunter's reaction to being restrained by the police was not a conscious or voluntary conduct: "It would very likely be reflexive." Given Hunter's diabetic and PTSD conditions, if he was forcefully subdued and tied onto a stretcher, Dr. Villa Bona stated "a person in that situation with that history would respond violently to total containment. I don't know if they could respond any other way." When specifically asked if Hunter intended to kick Greek, Dr. Villa Bona testified: "He intended to get free. I don't think whether or not he kicked anyone was in his mind at all."

Thus, the defense, as presented by the expert testimony of Dr. Villa Bona, was that Hunter was not acting either intentionally or voluntarily when he resisted arrest at the Smyrna police station and when he kicked Greek in the right arm. Dr. Villa Bona also noted that a diabetic should not consume alcohol since this can destabilize a patient's blood sugar. Although Dr. Villa Bona's expert opinions were not stated as being based upon the required evidentiary standard of a reasonable medical certainty or probability, there was no trial objection by the State to his expert opinion evidence.[8]

When Dr. Villa Bona's testimony concluded, the defense rested and renewed the motion for judgment of acquittal, again arguing that the State had failed to prove the *mens rea* element of either the Assault or the Resisting Arrest allegation. The trial judge denied the defense motion and ruled, in part:

> As to the voluntariness or lack of voluntariness of the defendant's conduct regarding assault and resisting arrest, the person who had the most—the person who had both the most expertise and observed the defendant was the paramedic, the paramedic. He didn't witness him when he was being arrested, but he witnessed him later. And he testified the defendant was lucid and knew what he was doing. I am not going to reject that testimony and accept as fact the testimony of Dr. Villa Bona.

### Jury Instruction Conference

At the jury instruction prayer conference, following the completion of all the trial testimony, Hunter's attorney again raised the issue that the Smyrna Police Department had not preserved a DVR recording of the events within the police station on the evening of September 2, 2009, when Hunter was taken into custody for the DUI offense. Hunter's attorney requested that the Assault and Resisting Arrest charges be dismissed for failure of the police to preserve the DVR recording. The Superior Court judge denied that motion.

As the prayer conference continued, however, the trial judge ruled that the failure of the police to preserve the DVR recording of what occurred during Hunter's altercation at the police station was negligent and that a missing evidence jury instruction was required. The trial judge said that he had never given a *Deberry*[9]

---

8. *See Oxendine v. State,* 528 A.2d 870, 873 (Del.1987).

9. *Deberry v. State,* 457 A.2d 744 (Del.1983).

missing evidence jury instruction before, but that one was required in Hunter's case. The record reflects that a *Deberry* missing evidence instruction was given to Hunter's jury, using the language approved by this Court in *Lolly v. State.*[10] Accordingly, the jury was instructed that if the DVR missing recording was available, its contents would be favorable to Hunter.

### Missing Evidence Analysis

▇▇▇ On appeal, Hunter argues that while the trial judge did give a missing evidence jury instruction tracking the suggested language in *Lolly v. State*, the trial judge should have dismissed Hunter's two charges of Assault and Resisting Arrest. Hunter's argument is based upon *Johnson v. State* where this Court held that "the failure to gather and/or preserve case dispositive evidence will completely preclude a prosecution."[11] The record does not support Hunter's argument that the DVR recording, if preserved, would have been case dispositive.

The obligation to preserve evidence is rooted in the Fourteenth Amendment to the United States Constitution and Article 1, Section 7 of the Delaware Constitution.[12] The seminal case decided by this Court is *Deberry v. State.*[13] The question presented in *Deberry* was "what relief is appropriate when the State had or should have had the requested evidence, but the evidence does not exist when the defense seek its production?"[14] *Deberry* instructs that the inquiry is analyzed according to the following paradigm:

1) would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or *Brady [v. Maryland]?*

2) if so, did the government have a duty to preserve the material? if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?

The consequences that should flow from a breach of the duty to gather or preserve evidence are determined in accordance with a separate three-part analysis which considers:

1) the degree of negligence or bad faith involved,

2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available, and

3) the sufficiency of the other evidence produced at the trial to sustain the conviction.[15]

As we have previously noted under similar facts, a discussion of *Brady* is a fruitless exercise because the evidence is no longer available.[16] Therefore, the first step in our *Deberry* missing evidence analysis is properly viewed in the context of Criminal Rule 16: "[U]nder Superior Court Criminal Rule 16(b), a defendant need only show that an item 'may be material to the preparation of his defense' to be discoverable."[17]

---

10. *Lolly v. State*, 611 A.2d 956, 962 n. 6 (Del.1992).

11. *Johnson v. State*, 27 A.3d 541, 548 (Del. 2011).

12. *Id.* at 545 (citing *Deberry v. State*, 457 A.2d at 744).

13. *Deberry v. State*, 457 A.2d at 744.

14. *Id.* at 749.

15. *Johnson v. State*, 27 A.3d at 545–46 (internal citations omitted).

16. *Id.* at 546.

17. *Id.* (internal citations omitted).

In this case, Hunter filed a Criminal Rule 16 request for the DVR recording. The State was in possession of the DVR recording from the outset, having created the evidence. However, the State was unable to produce the DVR because it had been automatically recorded over by subsequent events. Hunter's defense at trial was that he was not acting intentionally on that evening. He alleges that the tape would have shown that he was unable to control himself. There is no doubt that a DVR recording of the events at the Smyrna police station would have been subject to disclosure to Hunter under Criminal Rule 16.

The second step in a *Deberry* analysis requires an evaluation of whether the government had a duty to preserve the DVR recording. Although this Court has declined to prescribe exact procedures, we have held that in fulfilling its duty to preserve evidence, law enforcement agencies should create rules broad enough to encompass any material that could be favorable to a defendant.[18] In Hunter's case, the police were not gathering physical evidence that was then somehow misplaced; rather, they controlled the DVR equipment and created a recording of the events that led to the criminal charges at issue.

After the events at the Smyrna police station, it was clear that Hunter was going to be charged with Assault and Resisting Arrest. Without commenting on the general practice of a twenty-eight day automatic overwrite policy, increased diligence is required when a recording is made of an alleged event and the defendant is subsequently charged in connection with the event. That principle was discussed by this Court in *Hammond v. State*, when the State failed to preserve the crash vehicle even though criminal charges for vehicular homicide were pending.[19] In this case, the State had an obligation to preserve the DVR recording and that duty was breached.

The State's failure to preserve the DVR recording requires an examination of the consequences that must flow from that breach of duty. We begin by determining the degree of negligence or bad faith. Officer Dunning testified that the tape had never been reviewed after the recording, demonstrating that he did not know if the tapes would have been inculpatory or exculpatory for Hunter. Although the recording was ultimately overwritten, it was done automatically. There is no evidence that this was done deliberately or in bad faith.[20] Accordingly, the record supports the trial judge's conclusion that the Smyrna Police Department was negligent in failing to preserve the evidence by not preventing the automatic destruction of the recording after twenty-eight days.

The second consideration when there is a breach of the duty to preserve evidence is the importance of the missing evidence and the reliability of the remaining evidence. The other evidence in Hunter's case was the eyewitness testimony of Officer Dunning and EMT Greek, who was severely injured by Hunter. Eyewitness testimony evidence is probative and relevant, even though the credibility of a par-

---

**18.** *Deberry v. State*, 457 A.2d at 751–52. It is the imposition of this duty that ensures the government takes adequate steps to preserve evidence so that the defendant is not denied due process. *Id.* at 751.

**19.** *Hammond v. State*, 569 A.2d 81 (Del.1989).

**20.** *Compare State v. Wright*, 2011 WL 826357, at *3–4 (Del.Ct.Com.Pl.) (inferring willful destruction of DVR recording from the Rehoboth Police Department, because evidence demonstrated that the police had been warned before about failing to preserve recording, and continued to deliberately erase recordings).

ticular witness is left to the province of the jury.[21]

Finally, we must address the question of whether the remaining evidence introduced by the State at trial was sufficient to sustain a conviction for the charges of Assault and Resisting Arrest. Hunter alleges that without the DVR recording, the State is unable to prove that he acted "intentionally," a necessary element of both Assault and Resisting Arrest. The record reflects, however, that the State was able to prove intentionality beyond a reasonable doubt.

A person is guilty of Resisting Arrest with Force or Violence when:

> (1) The person intentionally prevents or attempts to prevent a peace officer from effecting an arrest or detention of the person or another person by use of force or violence towards said peace officer, or
>
> . . . .
>
> (3) Injures or struggles with said peace officer causing injury to the peace officer.[22]

A person is guilty of Assault in the Second Degree when "[t]he person recklessly or intentionally causes serious physical injury to another person." [23]

Officer Dunning testified on behalf of the State that after allowing Hunter to self-administer the insulin pump, he struggled to rehandcuff Hunter. After being taken to the Smyrna Police Department, Hunter continued to fight and struggle with Officer Dunning. The decision was then made to transport Hunter to Kent General Hospital. While attempting to secure Hunter's legs to the stretcher, Hunter repeatedly kicked at the police officers and the EMTs. Officer Dunning had to respond by using his stun gun on Hunter. At Kent General Hospital, while the staff was trying to draw Hunter's blood, he attempted to bite Officer Dunning, causing Officer Dunning to use his stun gun a second time.

EMT Greek also testified on behalf of the State. Greek corroborated Officer Dunning's accounts of Hunter's behavior. Greek testified that Hunter was violent and uncooperative, and that one of Hunter's kicks struck his right arm, causing severe ligament and bone damage. The injuries required surgery and caused Greek to miss six months of work. We hold that there is sufficient evidence in the record from which a jury was able to find Hunter guilty beyond a reasonable doubt for Resisting Arrest and Assault.

### *Missing Evidence Remedy*

 Nevertheless, the State must still bear responsibility for the Smyrna Police Department's failure to preserve the DVR recording. We remain convinced that fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant "[to] be evaluated in the context of the entire record." [24] When evidence has not been preserved, the conduct of the State's agents is a relevant consideration, but it is not determinative. Equally

---

**21.** *Hutchins v. State*, 153 A.2d 204, 207 (Del. 1959) ("It is a well-settled general rule of law that the jury are the sole judges of the degree of credit to be given to the testimony and that the determination of the creditability of witnesses is not within the province of the reviewing court.").

**22.** Del.Code Ann. tit. 11, § 1257.

**23.** Del.Code Ann. tit. 11, § 612(a)(2).

**24.** *Hammond v. State*, 569 A.2d at 87 (citing *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *Deberry v. State*, 457 A.2d at 752; Del. Const. art. I, § 7.

relevant is a consideration of the importance of the missing evidence, the availability of secondary evidence, and the sufficiency of the other evidence presented at trial.[25] "[T]here may well be cases which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."[26] That is what we meant in *Johnson v. State* when we stated "the failure to gather and/or preserve case dispositive evidence will completely preclude a prosecution."[27]

Hunter contends that it was error for the trial judge to refuse to issue a judgment of acquittal on the Assault and Resisting Arrest charges based upon the failure of the Smyrna Police Department to preserve the DVR recording. Hunter contends that the DVR recording would have been case dispositive with respect to those charges. Therefore, Hunter argues, fundamental fairness requiring a judgment of acquittal on those charges.[28]

The record does not reflect that the DVR recording would have been case dispositive evidence in this matter. Therefore, Hunter's criminal trial was not fundamentally unfair without that evidence. Hunter's trial defense was not a denial that he engaged in the conduct alleged (Assault and Resisting Arrest), but rather that Hunter lacked the required specific intent or *mens rea* to commit either offense because Hunter's mental condition, due to a combination of diabetes and PTSD, made his conduct at the Smyrna Police Station on September 2, 2009 involuntary.

The defense presented at trial through the expert testimony of Dr. Villa Bona, was that Hunter's conduct at the police station on the night of his DUI arrest was involuntary. Defense counsel argued to the jury in closing that Hunter should be acquitted because "[h]e never intended to harm anyone. He never intended to resist arrest." Given this defense that Hunter committed the conduct alleged, but his actions should be legally excused because Hunter was acting involuntarily, the missing DVR recording was not dispositive to resolving the disputed issue of whether Hunter was acting voluntarily or involuntarily.

The jury did not have to decide whether Hunter kicked Greek or resisted arrest because the physical conduct was essentially conceded. The issue for the jury was whether the required mental element of volitional action was present. A recording showing Hunter engaging in conduct, which he admitted, is only cumulative evidence that does not definitively resolve the disputed question of whether Hunter was unjustified in being combative or was a frightened individual behaving involuntarily as a result of his diabetes or PTSD. If the jury believed Dr. Villa Bona, that Hunter was not in control of his actions at the police station, the jury could have acquitted him.

We hold that the trial judge properly determined that a missing evidence jury instruction was a sufficient remedy for the State's failure to preserve the DVR recording. Fundamental fairness did not require a judgment of acquittal on the As-

25. *Bailey v. State,* 521 A.2d 1069, 1091 (Del. 1987); *Deberry v. State,* 457 A.2d at 752.

26. *Hammond v. State,* 569 A.2d at 87 (citing *Arizona v. Youngblood,* 488 U.S. 51, 61, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (Stevens, J., concurring)).

27. *Johnson v. State,* 27 A.3d at 548.

28. *Hammond v. State,* 569 A.2d at 81.

sault and Resisting Arrest charges in the context of the entire record of Hunter's case. Therefore, those judgments of conviction are affirmed.

### *Conclusion*

The Superior Court's judgment of conviction for DUI is reversed. The Superior Court's judgments of conviction for Assault in the Second Degree and Resisting Arrest with Force or Violence are affirmed. This matter is remanded for further proceedings in accordance with this opinion.