IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES J. HOFMANN, | § | |
| | § | No. 290, 2022 |
| | § | |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 2012008259 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: April 19, 2023
Decided: June 27, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 27th day of June, 2023, after consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) During the evening hours of December 19, 2019, James J. Hofmann was driving southbound on Route 1 near the Christiana Mall when his car collided with a guardrail. Shortly after Corporal Scott Shelton of the Delaware State Police ("DSP") responded to the scene, Hofmann was transported by ambulance to Christiana Hospital. At the hospital, Hofmann admitted to Corporal Shelton that, on the way to the mall, he had stopped at a liquor store to buy beer and vodka and then consumed four shots of vodka before driving to the mall. Corporal Shelton noticed that Hofmann's speech was "slurred" and that his breath smelled of alcohol.

(2)     Corporal Shelton obtained Hofmann's consent for a blood draw and then contacted DSP to procure a phlebotomist. The phlebotomist used a DSP blood-kit to draw a blood sample from Hofmann. Afterwards, Corporal Shelton, who watched the blood draw, placed Hofmann's blood sample into an evidence refrigerator. And two days later, DSP Crime Laboratory Director Julie Willey tested it. Using a headspace gas chromatograph, Director Willey determined that Hofmann's blood-alcohol concentration ("BAC") was 0.22—nearly three times the legal limit.[1] She then issued a Blood Alcohol Report and Certificate of Analysis reflecting the result.

(3)     Hofmann was eventually indicted on charges of driving under the influence of alcohol and failing to maintain a lane of travel. On the first day of what turned out to be a two-day jury trial in the Superior Court, Corporal Shelton testified on direct examination about the events leading up to and during Hofmann's blood draw, including how the phlebotomist drew and mixed Hofmann's blood sample. Corporal Shelton testified that, after he handed the phlebotomist a DSP blood-kit, the phlebotomist followed standard procedures when using the tube, needle holder,

---

[1] In Delaware, it is illegal for a person to drive a vehicle while under the influence of alcohol or while having an alcohol concentration of .08 or greater. 21 *Del. C.* § 4177(a). An alcohol concentration of .08 or more means that the amount of alcohol in a sample of the person's blood that is equivalent to .08 or more grams of alcohol per 100 milliliters of blood, or an amount of alcohol in a sample of a person's breath that is equivalent to .08 or more grams per 210 liters of breath. § 4177(c). Here, the amount of alcohol in a sample of Hofmann's blood was .22 grams of alcohol per 100 milliliters of blood.

and nonalcoholic swab contained in the kit to draw the blood sample from Hofmann's right arm. He further testified that the phlebotomist gently mixed Hofmann's blood sample with anticoagulant powder by inverting the tube several times and that the phlebotomist then packaged and sealed the blood sample before handing the DSP blood-kit back to Corporal Shelton. According to Corporal Shelton, this sequence—and the blood draw more generally—comported with the "standard procedures concerning how . . . blood is [to be] drawn by the phlebotomist[.]"[2]

(4) On cross-examination, Corporal Shelton conceded that he was not a trained certified phlebotomist. And when asked about specific steps taken by the phlebotomist, Corporal Shelton admitted that he did not recall whether the phlebotomist inserted the needle into Hofmann's arm before puncturing the test tube.

(5) The next day, Director Willey offered detailed testimony about her testing of Hofmann's blood sample. Addressing Corporal Shelton's uncertainty as to the sequence in which the phlebotomist inserted the needle and punctured the test tube, Director Willey said that, had the phlebotomist punctured the "blood tube['s]" seal before inserting the needle into Hofmann's arm, the vacuum in the tube would have "escape[d]" and Hofmann's blood would not have flowed into the tube.[3]

---

[2] App. to Answering Br. at B24.
[3] *Id.* at B52.

(6)     When the State moved the admission of Director Willey's Blood Alcohol Report and Certificate of Analysis, Hofmann objected on the grounds that "there's been no testimony yet that the phlebotomist actually followed the proper procedures to draw the blood out of [Hofmann's] arm."[4]  Over this objection, the court admitted the report and certificate, which certified that, in Director Willey's opinion, Hofmann's blood sample contained a blood alcohol concentration of 0.22. The court remarked that "there's no evidence that [the phlebotomist] didn't follow the instructions[.]"[5]

(7)     After the State rested its case, Hofmann moved for judgment of acquittal as to both charges.  Though framed as a motion for judgment of acquittal, Hofmann's motion essentially asked the court to revisit its decision to admit the blood-test results.  Hofmann reiterated his contention that the phlebotomist is "the only one who's trained to testify as to what the proper procedures are as stated in [the] blood-draw instruction sheet that comes with the blood test kit."[6]  But this time around, Hofmann supplemented the objection he made when the State offered the blood-test report into evidence, now adding that Corporal Shelton's memory lapse as to the sequencing of the needle insertion and the test-tube puncture left an irreparable gap in the report's foundation.  Thus, according to Hofmann, the court

---

[4] *Id*. at B63.
[5] *Id.* at B93.
[6] *Id.* at B80.

should not have admitted that evidence and, without it, the State's evidence was insufficient to support a conviction. The court disagreed with Hofmann's premise and denied the motion.

(8) The jury acquitted Hofmann of failing to maintain a lane of travel but convicted him of driving under the influence of alcohol under 21 *Del. C.* § 4177(a)(1) and a prohibited alcohol content under 21 *Del. C.* § 4177(a)(5). The Superior Court sentenced Hofmann as a third DUI offender to two years of Level V incarceration, suspended after 90 days for 12 months of Level II probation. Hofmann appealed to this Court.

(9) As he did in the Superior Court, Hofmann contends on appeal that, because "[t]he State in this case failed to call the phlebotomist who drew [his] blood to testify as to the steps or procedures [the phlebotomist] followed to draw the blood, . . . [it] failed to lay the proper foundation to admit the results of the blood test into evidence."[7] In particular, Hofmann maintains that the arresting officer's foundation testimony was deficient because he "could not state the order in which the phlebotomist performed vital steps[—the needle insertion and test-tube puncture—]of the blood draw."[8]

(10) It bears noting that Hofmann is not asserting a constitutional confrontation-clause claim because of the phlebotomist's absence from trial; his

[7] Opening Br. at 2.
[8] *Id.*

5

challenge is limited to the trial court's evidentiary ruling and, as he acknowledges, is reviewable under an abuse-of-discretion standard.[9]

(11) Hofmann is correct that the State is required to lay an adequate foundation for a defendant's BAC test result before it can be admitted into evidence at trial. We addressed this requirement in *Clawson v. State*[10] for breath tests and in *Hunter v. State*[11] for blood tests.[12] In each case, we concluded that the trial court abused its discretion by admitting BAC test results where the evidence showed that the State violated unambiguous manufacturer instructions for producing reliable test results.[13] As we have explained, "[f]ollowing the manufacturer's use requirements ensures the reliability of the scientific test."[14] "It is this guarantee of reliability and

---

[9] *See Clawson v. State*, 867 A.2d 187, 192 (Del. 2005) ("[W]e review a trial court's ruling admitting the evidence of an intoxilyzer test result over a defendant's objection under an abuse of discretion standard.").

[10] *Id.*

[11] 55 A.3d 360 (Del. 2012).

[12] *Clawson*, 867 A.2d at 192 ("We hold that in order for the result of the intoxilyzer test to be admitted, the State must lay an adequate evidentiary foundation showing that there was an uninterrupted twenty minute observation of the defendant prior to testing. . . . This is not a burdensome requirement given the purpose behind the twenty minute observation period and the significant consequence of admitting a test result into evidence."). *Cf. Davis v. State*, 202 A.3d 1125, 2019 WL 327962, at *2 (Del. Jan. 23, 2019) (TABLE) (holding that a "minor omission" in the testimony regarding a particular step in the blood-drawing procedure was "insufficient to show that the State did not follow proper procedure or otherwise failed to establish a proper foundation.").

[13] *See Clawson*, 867 A.2d at 193 ("The record does not show that . . . [any] police officer actually observed Clawson for an uninterrupted twenty minute period before inserting the intoxilyzer card into the machine. In the absence of this evidence, we must conclude that admitting the intoxilyzer test result constituted an abuse of discretion."); *Hunter*, 55 A.3d at 366 (holding that "two independent deviations from the manufacturer's required protocol, standing alone, each rendered the BAC test inadmissible due to the lack of a proper foundation.").

[14] *Hunter*, 55 A.3d at 365 (citing *Clawson*, 867 A.2d at 192).

accuracy that is the foundational cornerstone to the admissibility of the results of a scientific test. Without that guarantee of reliability, there exists too great a risk that a jury will be persuaded by scientific evidence that is unreliable."[15]

(12) Unlike in *Clawson* and *Hunter*, the record in this case does not show a departure from the manufacturer's instructions. To the contrary, Corporal Shelton's direct testimony, while not perfect, provided a reasonable basis for the Superior Court to conclude that the phlebotomist followed the proper procedures and that the State laid an adequate foundation for the admission of Hofmann's blood-test results.

(13) Hofmann does not claim that the testifying police officer was unfamiliar with the blood-kit manufacturer's instructions. Nor does he contend that, with the exception of the needle-insertion/blood-tube puncture sequencing testimony, the officer's testimony insufficiently touched upon the proper blood-draw procedures. Instead, he argues that the officer's uncertainty surrounding the sequencing testimony undermines the evidentiary foundation for the admission of the blood-test results. But this argument elides Director Willey's testimony that, had the phlebotomist followed an improper sequence, there would have been no blood in the tube to test. On top of that, as the trial court noted, "there's no evidence that [the phlebotomist] didn't follow the instructions other than saying [that the phlebotomist] didn't testify."[16]

---

[15] *Id.* at 365–66.
[16] App. to Answering Br. at B93.

7

(14) Hofmann's challenge to the foundation laid by the State for the admission of the blood test results is flawed in other respects. For instance, Hofmann's initial objection was predicated solely on his contention that the phlebotomist is required to testify about the blood-draw procedures. In making this argument, Hofmann relied principally on a Court of Common Pleas opinion, *State v. Smoak*,[17] which, in turn, relied upon a Superior Court transcript ruling. Perhaps because his objection was grounded in his belief that a categorical rule existed requiring a phlebotomist's presence at trial, Hofmann did not introduce or even recite the specific manufacturer's instruction about which the testifying officer's foundation testimony fell short. But now it appears as though Hofmann has abandoned this line of argument in this Court—he has not cited *Smoak* nor has he provided a copy of the transcript ruling. Instead, Hofmann has shifted his emphasis to a purported manufacturer's instruction that mandates a specific sequence for the needle insertion and blood-tube puncture that is not in the record. This hole in the record effectively precludes this Court from accepting the essential premise of Hofmann's argument.[18]

---

[17] 2018 WL 4846338 (Del. Com. Pl. Sept. 20, 2018).
[18] *See McConnell v. State*, 639 A.2d 74, 1994 WL 43751, at *1 (Del. Feb. 3, 1994) (TABLE) (noting that the defendant's failure to present evidence that calibration checks of an intoxilyzer machine was relevant to defendant's claim that the State had not provided an adequate evidentiary foundation for the admission of intoxilyzer results.).

8

(15) To summarize, the record includes testimony from a witness with knowledge—Corporal Shelton—that the phlebotomist followed the "standard procedures,"[19] which we understand to mean procedures consistent with the manufacturer's instructions. And he described those procedures in detail sufficient to allow the trial judge to then assess the reliability of the blood test ultimately performed by Director Willey. By contrast, Hofmann made no effort to present evidence that the blood draw was improperly conducted or to inform the trial court of the specific manufacturer's instruction that was arguably ignored. Under these circumstances, the Superior Court did not abuse its discretion in admitting the blood test results into evidence. And because Hofmann's motion for judgment of acquittal depended on the failed premise that the blood-test results were inadmissible, the Superior Court did not err in denying the motion.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[19] App. to Answering Br. at B24.